Filed 8/17/23  P. v. Young CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>GALE JOSEPH YOUNG,<br><br>    Defendant and Appellant. | A161098<br><br>(Contra Costa County<br>Super. Ct. No. 05-192328-3) |
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>TERRANCE WEBB,<br><br>    Defendant and Appellant. | A161100<br><br>(Contra Costa County<br>Super. Ct. No. 05-192328-3) |

THE COURT:

It is ordered that the opinion filed herein on July 25, 2023, be modified as follows:

1. On page 38, after the first phrase in the first full sentence on the page, beginning "Notwithstanding that defendants apparently failed to raise this argument in the trial court," add as footnote 27, the following footnote, which will require the renumbering of all subsequent footnotes:

> [27] In a petition for rehearing, Young's counsel asserts this theory was in fact presented to the trial

court.  He cites to a motion in limine filed by Webb's counsel which advances this theory, but that motion in limine was not cited in his briefing on appeal.  In any event, our observation that the argument *apparently* was not raised in the trial court is of no consequence because we rejected the theory of admissibility on the merits.

There is no change in the judgment.

Appellant Gale Joseph Young's petition for rehearing is denied.

Dated:

_____

HUMES, P.J.

Filed 7/25/23  P. v. Young CA1/1 (unmodified opinion)
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>     Plaintiff and Respondent,<br><br>v.<br><br>GALE JOSEPH YOUNG,<br><br>     Defendant and Appellant. | A161098<br><br>(Contra Costa County<br>Super. Ct. No. 05-192328-3) |
| THE PEOPLE,<br><br>     Plaintiff and Respondent,<br><br>v.<br><br>TERRANCE WEBB,<br><br>     Defendant and Appellant. | A161100<br><br>(Contra Costa County<br>Super. Ct. No. 05-192328-3) |

In a joint trial, a jury convicted defendants Gale Joseph Young and Terrance Webb of first degree murder, conspiracy to commit murder, and active participation in a criminal street gang.  The jury also made true findings on firearm and gang enhancements.  The trial court sentenced defendants to life without the possibility of parole.

On appeal, Webb contends the trial court violated his constitutional rights by seating jurors around the courtroom for social distancing purposes during the COVID-19 pandemic, and erred in admitting certain case-specific

hearsay evidence through an expert witness in violation of *People v. Sanchez* (2016) 63 Cal.4th 665 (*Sanchez*). Young challenges the prosecution's use of a peremptory challenge against an African-American juror and argues the trial court prejudicially erred in excluding certain third party culpability evidence. He also contends the judgment must be reversed in its entirety in light of Assembly Bill No. 333 (2021–2022 Reg. Sess.) (Assembly Bill 333), which amended Penal Code[1] section 186.22 to require proof of additional elements to establish an active participation offense or a gang-related enhancement. Young further asserts (1) insufficient evidence supported the lying-in-wait special circumstance finding, (2) the trial court committed various sentencing errors, and (3) the cumulative effect of multiple errors during trial requires reversal. Webb joins in all of Young's arguments on appeal.[2]

We agree with both defendants that their convictions for active participation in a criminal street gang and related enhancements must be reversed and vacated, and on remand the trial court must reduce their conspiracy to commit murder sentences to 25 years to life. On remand, the trial court must also exercise its discretion whether to stay defendants' sentences on their murder or conspiracy terms pursuant to section 654. The judgments are otherwise affirmed.

### I. FACTUAL AND PROCEDURAL BACKGROUND

We summarize only those facts necessary to resolve the issues raised on appeal. Additional relevant facts are included in the discussion below.

---

[1] All undesignated statutory references are to the Penal Code.

[2] Victoria Collins, Webb's girlfriend, was charged in the same information and was tried with both defendants. Collins was convicted, however, only of possession of ammunition and did not appeal.

## A. Big Block Harbor Road Gang

In 2018, defendants Gale Joseph "Red Bone" Young and Terrance Webb were members of Big Block Harbor Road (Big Block), a criminal street gang in San Francisco. Both men had been involved with the gang since they were young. Some other members of Big Block relevant to this case included Matthew Higginbotham, his brother, Michael,[3] and Charles "Buba/Prezi" Gardner.

## B. Shooting of Matthew Higginbotham

On July 24, 2018, Matthew was shot to death in Big Block territory. Matthew's murder was captured on security camera footage. The video showed two individuals "sort of hanging around" who left and returned in a car. One of the two got out of the car, and walked up to Matthew, who was sitting in another car. The individual appeared to reach in and shake Matthew's hand, then with the other hand pointed a gun and shot him multiple times. The other person in the car also fired shots as they drove away.

Webb and Matthew were close friends. Two days after Matthew's murder, Michael and Webb spoke by telephone on a recorded jail call. Michael told Webb about his anguish over his brother's death and shared his suspicion that someone knew something about it in advance. Webb told Michael that he knew "the actual story" of Matthew's murder, including who was responsible, because he had seen it "on camera." Webb told Michael he knew who the shooter and driver were.

Beginning the day after Matthew's murder and over the course of approximately 10 days, Webb received photographs and videos of Anthony

---

[3] We will refer to the Higginbotham brothers by their first names for clarity.

3

Singh and Trevon Richardson from Young and others on his cell phone, accompanied by text message exchanges apparently seeking to confirm their identities. On August 3, Young sent Webb an image of Singh with the message, " 'This round I am point man.' " Webb responded, " 'We go try again?' " Police discovered additional text exchanges tracking Singh's activities; at trial, a police detective opined that Webb was gathering intelligence and trying to find Singh and Richardson in an effort to find Matthew's killer. Among those messages were numerous texts between Webb and Lovell Bronson (codefendant Collins's son) in the days after Matthew's murder. In the messages, Bronson sent Webb photos and videos of Singh and information about his location and whether he was armed.[4]

## C. Shooting of Singh and Richardson

On August 18, 2018, Webb went to Young's home in Oakland for a few minutes around 8:50 p.m.[5] Then Webb drove to San Francisco, arriving in Bayview-Hunters Point around 9:25 p.m. Shortly after that, Webb went to downtown San Francisco where the City Nights nightclub (City Nights) is located. Webb was at City Nights from approximately 9:45 p.m. to 12:30 a.m. the next morning. At 10:18 p.m., Young texted Webb asking, " 'We on it tonight, or you acting like a weirdo?' " Around 12:30 a.m., Young called Webb and they spoke by phone for approximately 15 minutes. Webb returned to Oakland, picked up Young, and drove back to City Nights.

---

[4] It appears Bronson knew Singh—in one text to Webb, he reported a conversation in which Singh told Bronson about his gun and said he wanted to " 'line some up.' "

[5] Defendants' and the victims' locations at specific points on August 18 and 19, 2018 were determined primarily from cell phone tower data, a tracking device on Singh's vehicle, a police license plate reader system, and video footage from the City Nights nightclub in San Francisco, a Valero gas station, a tire business, and a Bay Area Rapid Transit (BART) station.

4

Meanwhile, Singh and Richardson left Richardson's home in Antioch in Singh's pink Infiniti SUV just before 10:00 p.m. and drove to San Francisco.[6] Around 10:45 p.m., they parked near City Nights, and then entered City Nights.

Bronson was also at City Nights that night with a friend, Trevon Dickerson. In a text message, Dickerson told Bronson he had seen someone on the stairs. Bronson told Dickerson to " 'keep an eye on' " him.

At approximately 1:20 a.m. (August 19), Webb and Young arrived near City Nights. Bronson left City Nights at 1:37 a.m. A few minutes later, Bronson, Webb, and Young all met at the location where Singh's car was parked near City Nights.

Shortly after 2:15 a.m., Singh and Richardson left City Nights and traveled from San Francisco to Antioch. Webb and Young followed Singh's car towards Antioch, a few minutes behind. Taken together, the cell phone data, license plate reader data, and video evidence appear to show Webb and Young were traveling closely together in separate cars; Webb was driving a Dodge Charger, while Young was in a Honda.

Just before 3:00 a.m., Singh's Infiniti stopped at a Chevron gas station in Pleasant Hill. Young and Webb did not stop at the Chevron station but continued east to the Mira Vista Hills apartment complex (Mira Vista apartments), where Richardson lived. Young remained at the apartments, but Webb drove back in the direction they had come in the Dodge Charger. The Charger pulled into a Valero gas station at 2101 Somersville Road in Antioch. Webb put $40 on a gas pump and started pumping gas into his vehicle.

---

[6] The San Francisco Police Department had placed a GPS tracking device on Singh's car.

Singh's car passed by the Valero station headed in the direction of the Mira Vista apartments. Webb ducked down and returned the nozzle to the pump, leaving approximately $23 on the pump and not collecting the balance due on the transaction. He got back into his vehicle, turned his headlights off, and drove out of the Valero station, following Singh's car.

Around 3:25 a.m., Singh parked his car in a carport at the Mira Vista apartments. Before he turned off the engine, he was shot at least four times in the neck and shoulder. Richardson was shot three times in the legs. A resident at the apartments heard gunshots, then saw a Dodge Charger speeding away shortly after the shots were fired. Another resident told police he also heard gunshots and believed he saw two or three vehicles leave the scene. Young and Webb drove west on Highway 4, away from the murder scene.

Richardson called 911. He told the 911 operator that he did not know or see who shot him.[7] When police officers arrived on the scene, they found Singh dead in the driver's seat of the Infinity. The car was running and the headlights were on. Officers followed a trail of blood from the passenger door of the SUV and found Richardson lying on the ground on the opposite side of a nearby apartment building. He was on a video phone call when officers found him.

Around 4:00 a.m., Webb and Young arrived at Young's home in Oakland. At 4:07 a.m., Webb and Young talked by phone. At 4:16 a.m., Young texted Webb and Gardner, " 'Just when you thought you didn't need Bone [(Young)].' "

---

[7] Richardson did not testify at trial.

## D. Procedural Background

On May 27, 2020, the Contra Costa County District Attorney filed a first amended information charging defendants with first degree murder of Anthony Singh (§ 187, subd. (a); count 1); attempted premeditated murder of Trevon Richardson (§§ 187, subd. (a), 664; count 2); conspiracy to commit murder (§ 182, subd. (a)(1); count 3); active participation in a criminal street gang (§ 186.22, subd. (a); count 4); and criminal street gang conspiracy (§ 182.5; count 5).[8]  Special circumstances (lying in wait, gang murder) were alleged as the first degree murder charge, firearm enhancements were charged as to counts 1 and 2, and gang enhancements were charged for counts 1, 2, and 3.

The prosecution presented testimony from gang expert San Francisco Police Sergeant Daniel Manning in support of its theory that Young and Webb murdered Singh in retaliation for his killing of Matthew.  The prosecution also presented extensive evidence regarding (1) surveillance video footage captured from America's Tire Company in Antioch, the Valero gas station in Antioch, a BART station in Antioch, and City Nights in San Francisco; (2) data from a police license plate reader system; (3) an expert on cellular analysis who testified to the locations of Webb's, Young's, and Bronson's phones and mapped them to GPS tracking data from Singh's car; (4) iCloud account data[9] and call detail records; and (5) the contents of recorded telephone calls from San Francisco County jail.

Neither Webb nor Young testified at trial.  The defense presented an expert in GPS tracking, cell tower antenna function, and cell phone tracking

---

[8] Count 5 was dismissed prior to submission of the case to the jury.

[9] iCloud account data can include photos, videos, messaging data, location data, and e-mails.

technologies who opined that Young was not at the Valero gas station and that if his cellphone was in the vicinity of the Mira Vista apartments, it would have connected to a different cell tower, suggesting that Young was not at the scene of the murder.

The jury convicted defendants of first degree murder, conspiracy to commit murder, and active participation in a criminal street gang (counts 1, 3, and 4), and acquitted them of attempted murder (count 2). As to count 1, the jury found true the lying-in-wait special circumstance, but not the gang murder special circumstance. The jury further found true that the murder and conspiracy were committed for the benefit of a criminal street gang, and with respect to the murder, that a principal discharged a firearm causing injury.

On October 1, 2020, Webb and Young were both sentenced to two consecutive terms of life without the possibility of parole for murder and conspiracy to commit murder, plus 25 years for the gun use enhancement. The court imposed an additional concurrent term of two years for active participation in a criminal street gang. Defendants timely appealed. We granted a motion to consolidate the appeals.

## II. DISCUSSION

### A. *Seating of Jurors*

Webb first contends he was deprived of his constitutional rights to due process and a fair trial when the trial court seated jurors throughout the courtroom for social distancing purposes due to the COVID-19 pandemic.[10] Webb asserts that because of the seating arrangement, jurors in the gallery "would have been unable to properly observe" him, and he and his counsel

---

[10] Young did not join this argument, nor Webb's argument regarding *Sanchez* violations discussed below.

8

were not able to observe the jurors seated in the audience, all of which violated his constitutional rights.

Webb's trial took place at the beginning of the COVID-19 pandemic, from February to June 2020. In order to maintain social distancing, the trial court seated five jurors in the jury box and seated the other seven around the courtroom in the first few rows of the gallery. The court considered, but rejected, the possibility of holding the trial in a different courthouse, and observed that even if it were held in a different location, not all jurors could be seated in the jury box.

As an initial matter, we reject Webb's claim because it is unsupported by the record. Although he contends he was not able to see the jurors and they were unable to see him, none of his citations to the record support that assertion.

To the contrary, the record reflects that the trial court made every effort to ensure the jurors could see defendants and vice versa. The day before opening statements, the court stated: "And you'll notice that we've tried to place all of the defendants in the situation so they can see the jury and the jury can see them." A little later, the court stated: "I wanted to make sure that none of the defendants had their backs to the jurors, that they could be seen. But really also, they want to be able to see the jury. I'm sure they want to be able to see reactions and other things and then have discussions with their attorneys about those sorts of things. [¶] So that's why the Court made sure to turn folks in such a way that they could get a good view of everything in the courtroom."

Immediately after the court made this record, Young's attorney objected, stating, "I'll object to this seating suggestion where jurors are around the courtroom, some of whom are going to be behind me and oblique

9

to my client." Webb's counsel joined the objection, but did not state any additional facts with respect to his client's view of the jurors.

The description of "some" jurors being seated behind *Young's* counsel and "oblique" to *Young* says nothing about the jurors' relationship to where Webb and his counsel were seated in the courtroom. There is no basis *in the record* to infer Webb was unable to see any juror he wanted to see or that any jurors could not see him.

Moreover, the record suggests that no matter what configuration the trial court implemented, some accommodations would be necessary to comply with social distancing protocols, which at the time required all witnesses, jurors, parties, attorneys, and attendees to be seated at least six feet apart. As the trial court explained, even if the trial were held in a different courtroom, not all jurors could be placed in the jury box and some would need to be seated in the gallery. The logistics were no doubt further complicated by the fact that the court had to accommodate three defendants and their counsel. Webb does not suggest any alternative to the trial court's dilemma.[11]

---

[11] Although Webb's counsel suggested at oral argument that the trial court made a hasty decision regarding seating arrangements in the courtroom and failed to consult with all parties to find the best configuration, the record reflects the opposite is true. The transcript contains multiple lengthy discussions of COVID protocols, including discussions about seating arrangements for jurors, defendants, counsel, experts, and members of the public. Further, with specific reference to concerns about seating, the court told counsel: "I'm open to suggestion. As we go, if you come up with ideas, I'm happy to entertain them." At another point, the court's comments on the record reflect the court listened patiently to concerns from all counsel then stated, "Okay. I'll consider all of those requests that I've heard here on these issues. I'm going to think about it a little bit." Webb's counsel's suggestion at oral argument that the court paid little attention to seating is belied by the trial court's careful efforts and thoughtful consideration.

In any event, even if the jury was not able to observe Webb the entire trial and he and his counsel had to turn around to see some jurors, he has not shown a violation of his constitutional rights. California appellate courts have repeatedly rejected claims of constitutional violations with regard to safety precautions taken by trial courts during the COVID-19 pandemic. (See, e.g., *People v. Edwards* (2022) 76 Cal.App.5th 523, 525–527 [mask requirement did not violate confrontation rights]; *People v. Lopez* (2022) 75 Cal.App.5th 227, 232–236 [same]; *People v. Alvarez* (2022) 75 Cal.App.5th 28, 34–39 [same].) As those courts (and many others) have recognized, following public health mandates during the pandemic "served an important state interest in protecting the public from a contagious, and too often, lethal disease" (*Alvarez*, at p. 36), and courts retain "inherent authority . . . to promulgate procedures best suited for their particular courtrooms as they confront the challenges presented by the global pandemic" (*Lopez*, at p. 236).

We find *People v. Kocontes* (2022) 86 Cal.App.5th 787 particularly apt here. In *Kocontes*, the court rejected several arguments that the courtroom configuration during the defendant's criminal trial in the early COVID-19 pandemic violated his federal constitutional rights. (*Id.* at pp. 866–880.) In that case, jurors were seated in a similar configuration as in this case—four in the jury box, one in the well, and 11 in the audience throughout the courtroom, pursuant to social distancing guidelines. (*Id.* at pp. 868, 880.) The defendant moved for a mistrial, arguing in part that the social distancing requirements disadvantaged the defense. (*Id.* at p. 869.) As the *Kocontes* court explained in rejecting the defendant's claim that the configuration violated his right to due process and a fair trial: "The unprecedented global health crisis required the trial court to balance Kocontes's constitutional rights, the jurors' health, and preserving judicial resources. Judicial officers

11

at all levels undergo extensive training beginning shortly after they are sworn in.  But no training prepared this court, and courts across the United States, with the unique challenges COVID-19 presented.  The record reflects the court remained appropriately focused on these compelling interests." (*Id.* at p. 880.)  On review of the record in this case, the trial court here similarly engaged in extensive efforts to accommodate these rights and interests.[12] Webb's constitutional rights were not violated.

## B.  Expert Gang Testimony

Webb next contends the trial court erred in admitting improper expert witness testimony from San Francisco Police Sergeant Daniel Manning that lacked foundation, relied on hearsay in violation of *Sanchez*, and purported to opine on Webb's state of mind or intent.  He also contends the improperly admitted evidence violated his confrontation rights.

Under Evidence Code section 1200, hearsay evidence—evidence of an out-of-court statement offered to prove the truth of the matter stated—is generally inadmissible unless it falls under a hearsay exception.  (*Sanchez*, *supra*, 63 Cal.4th at p. 674.)  In *Sanchez*, applying the hearsay rule to expert

---

[12] Webb cites a statement from Justice Kennedy's concurring opinion in *Riggins v. Nevada* (1992) 504 U.S. 127, that "[a]t all stages of the proceedings, the defendant's behavior, facial expressions, and emotional responses combine to make an overall impression on the trier of fact, an impression that can have a powerful influence on the outcome of trial."  (*Id.* at p. 142 (conc. opn. of Kennedy, J.).)  *Riggins* did not consider or decide whether accommodations to seating arrangements for jurors mandated by public health guidelines in the middle of a global public health emergency would impermissibly interfere with a defendant's constitutional rights.  (See *id.* at p. 138 (maj. opn. of O'Connor, J.) [trial prejudice may be justified by an essential state interest].)  In any event, the record here reflects that the defendants' ability to see the jurors and vice versa were among the key concerns the trial court sought to accommodate in implementing the courtroom configuration used at trial.

testimony, our Supreme Court explained, "When any expert relates to the jury case-specific out-of-court statements, and treats the content of those statements as true and accurate to support the expert's opinion, the statements are hearsay." (*Sanchez,* at p. 686.) Although "[a]ny expert may still *rely* on hearsay in forming an opinion, and may tell the jury *in general terms* that he did so[,] . . . [¶] [w]hat an expert *cannot* do is relate as true case-specific facts asserted in hearsay statements, unless they are independently proven by competent evidence or are covered by a hearsay exception." (*Id.* at pp. 685–686.) "Case-specific facts are those relating to the particular events and participants alleged to have been involved in the case being tried." (*Id.* at p. 676.) Thus, under *Sanchez,* hearsay statements containing case-specific facts are admissible only if they fall under a hearsay exception or are independently proven. (*Id.* at p. 686.)

Nonetheless, to challenge inadmissible evidence, an objection must be timely and specific, and the failure to make an appropriate objection forfeits the right to appellate review unless an objection would have been futile. (See Evid. Code, § 353, subd. (a); *People v. Clark* (1992) 3 Cal.4th 41, 125–126.) "This [rule] applies to claims based on statutory violations, as well as claims based on violations of fundamental constitutional rights." (*In re Seaton* (2004) 34 Cal.4th 193, 198.) Here, we conclude Webb forfeited his contentions by failing to object to Manning's testimony in the trial court.

In a footnote, Webb asserts that "[t]o the extent objections were articulated by defense counsel" for his codefendants, the trial court assumed objections were joined by all parties.[13] The only record citation he provides for that assertion, however, refers to a discussion among court and counsel

---

[13] We observe "[f]ootnotes are not the appropriate vehicle for stating contentions on appeal." (*Sabi v. Sterling* (2010) 183 Cal.App.4th 916, 947.)

13

regarding members of the Singh family wearing face masks with his picture on them. That exchange does not suggest that the trial court assumed all defendants joined in all *evidentiary* objections, particularly given that the parties regularly expressly joined in each other's arguments and the trial court often asked whether parties joined in a particular objection. Indeed, the trial court specifically denied a request by codefendant Collins's counsel to "lodge a standing *Sanchez* objection for the duration of the [gang] expert's testimony on these issues,"[14] telling her, "You'll need to make your objections to the questions as they come. I won't accept a standing objection." Webb's suggestion that the court understood he was objecting on *Sanchez* grounds even when his counsel did not assert such an objection is unpersuasive.

Even if Webb preserved objections to the testimony he challenges on appeal, however, his claims would lack merit.[15]

First, Webb argues that Manning impermissibly relayed out-of-court statements of nontestifying declarants in violation of *Sanchez*. Webb asserts that Manning testified "in a number of instances" to opinions that were based on information from unidentified "informants." The record citations he provides for that claim, however, are two instances in which Manning's testimony was based *in part* on information from informants.[16] Further,

---

[14] It appears "these issues" referred to Manning's testimony regarding specific prior convictions of an alleged gang member (or possibly multiple gang members).

[15] Webb also argues that to the extent his counsel failed to object, he rendered ineffective assistance. We address his claims on the merits in part to resolve this alternative claim.

[16] Manning based his opinion that one individual was a gang member on "his criminal history, his tattoos, my observations of him in Big Block gang territory. Informant information." As to another individual, Manning

14

Manning testified *generally* that he relied on information from informants, not the content of their statements. This is entirely permissible.[17] (*Sanchez, supra,* 63 Cal.4th at p. 685 [an expert "may still *rely* on hearsay in forming an opinion and tell the jury *in general terms* that he did so"].)

Next, Webb contends that Manning was permitted to testify about his opinion that Big Block members were embarrassed by Matthew's killing and felt they had been tricked because his killer(s) pretended to be associated with an affiliated gang. When asked how Big Block members would have reacted to the circumstances of Matthew's murder, Manning testified: "*I was told* they were embarrassed. I was told—obviously, they were very upset. You can hear it in Michael's voice in the call. So I know that's true. [¶] It was a slap in the face that Matthew was killed right there where he was killed and how he was killed." (Italics added.) When the prosecutor asked how rivals would have reacted to the circumstances of the murder, Manning testified: "It was embarrassing for Harbor, *I was told.*" (Italics added.) Manning also said that he "heard . . . *from informants*" that Matthew's killers "were pretending they were from Kirkwood [(an allied gang)]." (Italics added.) Webb asserts all of this testimony was inadmissible case-specific hearsay.

---

testified he "arrested him after receiving information from an informant in Marin County."

[17] Webb also asserts broadly that "Manning offered expert testimony that relied upon, and related to the jury as true, information compiled during investigation of crimes." In support of this assertion, he cites to 27 pages of the reporter's transcript without identifying or discussing any particular testimony. Needless to say, we will not wade through the record to make an argument for him. (See *DeNike v. Mathew Enterprise, Inc.* (2022) 76 Cal.App.5th 371, 388, fn. 11 [appellate court will not examine undeveloped claims or make arguments for parties].)

We disagree with Webb's assertion the latter statement violated *Sanchez*, because it was independently established by other admissible evidence introduced at trial. (*Sanchez*, *supra*, 63 Cal.4th at p. 686; *People v. Camacho* (2022) 14 Cal.5th 77, 129–130.) Manning's comment that he heard from *informants* that Matthew's killers pretended to be from another gang was offered as part of a longer response to a question about the meaning of the recorded jail phone call between Michael and Webb. On cross-examination, defense counsel asked Manning, specifically with reference to Webb's use of the term "movement"[18] during that phone call: "Now with regard to the way in which Mr. Webb uses it, he's essentially saying that the—well, based upon what you've heard and read and seen in the phone call, essentially what's being said is that these two individuals that were responsible for killing Matthew were pretending like they were down with the movement; is that correct?" Manning responded: "That's correct. *And* I had heard that from informants, *too*, that they were pretending they were from Kirkwood." (Italics added.) In response to further questions regarding the contents of the phone call, Manning explained that Webb and Michael discussed that Singh and Richardson pretended "to know people in Kirkwood." Thus, the hearsay from unspecified informants merely reiterated what Webb and Michael discussed in the recorded jail phone call, the admissibility of which Webb does not challenge.

Similarly, with respect to the testimony that gang members were "embarrassed" by the circumstances of Matthew's murder, it is clear from Manning's testimony that he was relying not only on comments he heard

---

[18] Manning testified he had heard about the "movement" since he was assigned to the gang task force in 2007 or 2008, and it referred to the "purpose of the gang" or a "type of, you know, calling to be in this gang activity."

from unidentified informants, but on the contents of the recorded phone call with Michael and what he knew from his own experience as a member of the gang unit in interpreting the conversation between Webb and Michael. Manning testified he could "hear it in Michael's voice in the call. . . . [¶] It was a slap in the face that Matthew was killed right there where he was killed and how he was killed." Manning also testified without objection that, "One of their gang members was killed. Obviously, it's been my experience to retaliate and to get your pound of flesh from the people who did that." He further explained that "there was obviously some confusion within the gang of what happened and how it was allowed to happen." In addition, in earlier testimony about Matthew's murder, Manning explained that "it was not a fair way he was murdered. . . . you were ambushed, didn't get a chance, or someone set you up to be murdered. It wasn't like a gang battle and you died an honorable death." Because Manning's opinion regarding the gang's reaction to the circumstances of Matthew's murder was based both on the content of Michael and Webb's phone call and Manning's background knowledge and experience, there was no *Sanchez* violation.[19]

Webb also contends that Manning's testimony exceeded the proper scope of expert testimony because he testified to Webb's subjective mental state and intent, and thus, invaded the province of the jury by offering an opinion as to the ultimate question of his guilt. Specifically, Webb points to Manning's testimony that (1) Big Block members were embarrassed about Matthew's shooting; (2) Webb and others believed Singh and Richardson had pretended to be from Kirkwood; and (3) a comment on social media stating,

---

[19] Further, as the Attorney General points out, had Webb objected to Manning's testimony as hearsay, Manning would have had an opportunity to give similar testimony without referring to hearsay and elaborate on how his experience informed his opinion.

17

" 'My heart is heavy right now.  Rest up, little bro.  We got it from here,' " was a statement by Webb intending to reassure Michael that he would avenge Matthew's death and demonstrated his "leadership role" in the gang. [20]

First, Webb has again forfeited his objections to all of this testimony as he failed to object on these grounds in the trial court.  (Evid. Code, § 353, subd. (a).)  In any event, they lack merit.

In making this argument, Webb relies on *People v. Killebrew* (2002) 103 Cal.App.4th 644 (*Killebrew*), in which the appellate court reversed a conviction for possession of firearms because a gang expert impermissibly testified as to the defendant's subjective knowledge and intent to possess a handgun.  While testimony regarding the expectations, culture, and habits of a gang would have been permissible, the court held the expert could not testify to the knowledge and intent of an individual defendant because such issues were reserved to the trier of fact.[21]  (*Killebrew*, at pp. 654–658.)

Here, Manning did not offer an opinion about Webb's knowledge and intent when he committed the crime against Singh—he testified to the reaction of the gang in general to the circumstances of *Matthew's* murder. That brief testimony, that Big Block members generally were "embarrassed" because they had been "snaked" (i.e., tricked) by two individuals pretending to be with the Kirkwood gang, was about the gang's culture and expectations, not an inference Manning had drawn about *Webb's* intent or state of mind at

---

[20] As the Attorney General correctly observes, Manning testified his opinion that Webb held a leadership role in Big Block was based on Webb's recorded conversations with Michael, not the comment on social media.

[21] Our Supreme Court disapproved of *Killebrew* to the extent it concluded an expert could not express an opinion based on hypothetical questions that tracked the evidence as to whether an assault would have been committed for a gang purpose.  (*People v. Vang* (2011) 52 Cal.4th 1038, 1048–1049.)

the time of the murder. Further, as explained above, Manning's opinion about Big Block's reaction to Matthew's death was supported by other evidence, including the contents of Webb and Michael's phone call, the admissibility of which Webb does not challenge on appeal.

In any event, even if some of Manning's testimony was inadmissible, any error was harmless beyond a reasonable doubt. There was overwhelming evidence that Webb was a Big Block member who participated in the conspiracy to kill Singh. Manning had known Webb for many years and knew he was a Big Block member based on photographs, his posts to social media, his tattoos, and admissions in a prior federal case. Manning also provided extensive background on Big Block's history as a gang and gave his expert opinion that Young, Michael, and others involved in the conspiracy were gang members based on his personal knowledge, photographs, videos, and posts on social media. Further, while the gang evidence tended to establish a motive for Singh's murder, that same motive would have been apparent notwithstanding the hearsay statements based on the contents of the recorded phone call between Webb and Michael and Manning's other testimony about retaliation. In addition, other properly admitted evidence showed additional motives: that Webb was very close to Matthew and Michael, and felt an obligation to Michael and his mother to avenge Matthew's murder. Thus, Webb had a strong motive regardless of the gang evidence.

And even without the evidence regarding motive, the murder and conspiracy to commit murder were proven by the incriminating text messages, phone calls, GPS tracking data, video footage, and cell tower data showing defendants followed the victims from San Francisco to Antioch and were at the murder scene when Singh was killed. Thus, the impact of any

19

improper gang evidence on the murder and conspiracy charges was harmless beyond a reasonable doubt. (*Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*).)

## C. Batson/Wheeler *Error*

Both defendants[22] contend the trial court erred in failing to find a prima facie case of racial discrimination based on the prosecutor's use of a peremptory challenge to strike an African-American juror in violation of *Batson v. Kentucky* (1986) 476 U.S. 79 (*Batson*) and *People v. Wheeler* (1978) 22 Cal.3d 258 (*Wheeler*).

### 1. Background Facts

Before voir dire, prospective jurors completed questionnaires, though none of the questionnaires or responses have been included in the appellate record.

During voir dire, the trial court questioned Prospective Juror B., who told the court that he had brothers and a nephew who had been through the criminal court system in Contra Costa County. Prospective Juror B. did not recall the specific details of their cases. When the court asked if there was anything about how they had been treated by law enforcement or the courts that left Prospective Juror B. feeling like his relatives had been treated unfairly, he responded, "Not really, I guess." He also denied feeling like their lawyers did not do their jobs and said he did not know anything about who prosecuted the cases.

Prospective Juror B. told the court he had been court-martialed in 1980. When the court asked if there was anything that "lingers with you"

---

[22] This argument and the remaining arguments addressed in this opinion were briefed on appeal by Young. Webb filed a joinder in all of Young's arguments.

20

from that experience that would "creep into this case," Prospective Juror B. said simply, "No." He also confirmed that he was trained in firearms because of his background in military service and his work in security. When asked by the court, Prospective Juror B. confirmed that he would be able to follow the law as it relates to firearms or ammunition, even if he did not agree with it.

The court next asked Prospective Juror B. about a situation where he "spent time for a traffic violation and a DUI," and asked whether he would characterize that as a negative experience.[23] Prospective Juror B. confirmed he would. The court asked, "Can you tell me about that a little bit?" and he responded, "Not really." He told the court those experiences were in the "90's, maybe," and said he thought they were in Alameda County. Prospective Juror B. denied those experiences would cause him to assess the testimony of a police officer differently than testimony by others. He confirmed he could be fair to both sides. The court then asked, "Is there anything else? I feel like you're waiting to add something there," to which he responded, "No. I don't want to add nothing."

Later in voir dire, the prosecutor questioned Prospective Juror B. Prospective Juror B. told the prosecutor that he had nine brothers, and confirmed that he communicated with them frequently. When asked if he had talked with them about their cases, Prospective Juror B. responded, "Probably have." The prosecutor asked if he had a sense of what their cases involved and he said, "It's a little bit of everything." Prospective Juror B. said it had "been . . . . [o]ver a decade" since his brothers' cases. He confirmed he had attended court during his brothers' cases and that they went to trial. He

---

[23] It is unclear from the record whether the traffic violation and DUI were separate incidents.

21

did not know how many cases went to trial.  One of his brothers was tried for murder and served time.  That brother was out of custody and Prospective Juror B. denied that anything about the trial or conversations with his brother "stay[ed] with" him.  He could not remember details about trials for any of his other brothers.

Prospective Juror B.'s nephew, who had recently been released, served time for robbery or burglary.  Asked if he had talked with his nephew about his case, he responded, "Probably have."

Regarding his court-martial in the early 1980's, Prospective Juror B. said, "The whole thing was unfair.  I was young.  I didn't have representation, I guess."  He then added, "But that was decades ago, so I'm over it."  He was discharged from the army after his court-martial.

Prospective Juror B.  told the prosecutor that he believed his DUI was in the 1990's and he served 30 days in jail.  When the prosecutor asked if he was satisfied with his legal representation in that case, he responded, "I guess back then it was either pay or sit," so he "sat."  Asked if he thought that was unfair at the time, he said, "No.  Yeah.  Because it's the way of writing tickets out for no reasons.  So yeah."  The prosecutor asked if he still felt strongly about that, but Prospective Juror B. said, "That was back then. It's a new time."

Counsel for Young and Webb asked Prospective Juror B. general questions about whether he could carry out his duties as a juror and follow the law.  They did not ask about his DUI, court-martial, or relatives in the criminal justice system.

The prosecutor used her third peremptory strike to remove Prospective Juror B. from the jury.  Codefendant Collins's counsel brought a *Batson/Wheeler* motion, arguing that Prospective Juror B. appeared to be an

22

African-American juror who had not "given any answers to give rise to excusal." Young's counsel joined the objection, stating that "maybe one or two" other African-American jurors were seated in the venire. Webb's counsel also joined in the objection, noting for the record that all of the defendants are African-American.

The court first stated that Prospective Juror B. was "a member of a cognizable group as he is African American," but ruled the defense had not made a prima facie case showing "just because [he] is in a cognizable group." The court stated there were "race neutral reasons why a prosecutor would excuse" Prospective Juror B., noting he "has many family members who have been through the court system." The court further observed that Prospective Juror B. had been "evasive" in his responses to the prosecutor and the court on voir dire. The court gave the prosecutor an opportunity to state a response on the record. The prosecutor agreed there had been an inadequate showing because he was the "first apparently African American juror who I've exercised a peremptory against," and asserted there was "no established pattern of kicking members from that cognizable class."

### 2. Analysis

Although a prosecutor may exercise a peremptory challenge to strike a prospective juror " 'for any reason, or no reason at all' " (*People v. Scott* (2015) 61 Cal.4th 363, 387 (*Scott*)), he or she may not use a peremptory challenge to " 'strike prospective jurors on the basis of group bias—that is, bias against "members of an identifiable group distinguished on racial, religious, ethnic, or similar grounds" ' " (*People v. Bell* (2007) 40 Cal.4th 582, 596 (*Bell*), disapproved on another ground in *Sanchez, supra*, 63 Cal.4th at p. 686, fn. 13). Doing so violates a defendant's federal right to equal protection set forth in *Batson, supra*, 476 U.S. at pages 88 to 89, and his or her state right

23

to a trial by a jury drawn from a representative cross-section of the community under article I, section 16 of the California Constitution set forth in *Wheeler, supra,* 22 Cal.3d at pages 276 to 277. (Accord, *People v. Gutierrez* (2017) 2 Cal.5th 1150, 1157.) As our Supreme Court explained in *Scott*, "The *Batson/Wheeler* framework is designed to enforce the constitutional prohibition on exclusion of persons from jury service on account of their membership in a cognizable group. It is also designed to otherwise preserve the historical privilege of peremptory challenges free of judicial control, which 'traditionally have been viewed as one means of assuring the selection of a qualified and unbiased jury.' " (*Scott*, at p. 387.)

A defendant bears the ultimate burden of showing a constitutional violation (*People v. Lenix* (2008) 44 Cal.4th 602, 612–613 (*Lenix*)), but courts employ a three-step, burden-shifting mechanism in assessing whether a *Batson/Wheeler* violation has occurred. The defendant must first "make out a prima facie case by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose in the exercise of peremptory challenges." (*Scott*, *supra*, 61 Cal.4th at p. 383.) If the trial court finds the defendant has established this prima facie case, the prosecutor must then "explain adequately the basis for excusing the juror by offering permissible, nondiscriminatory justifications." (*Ibid*.) Lastly, the court must make a " 'sincere and reasoned effort to evaluate the nondiscriminatory justifications' " (*People v. Williams* (2013) 56 Cal.4th 630, 650) and decide whether the prosecutor's proffered reasons are subjectively genuine or instead a pretext for discrimination (*Scott*, at p. 383; *People v. Duff* (2014) 58 Cal.4th 527, 548).

Here, the trial court denied defendants' *Batson/Wheeler* motion at the first step, finding there had not been a prima facie showing of discrimination.

24

We apply the deferential substantial evidence standard of review to the trial court's ruling. (*People v. Battle* (2021) 11 Cal.5th 749, 772 (*Battle*); *People v. Silas* (2021) 68 Cal.App.5th 1057, 1095.) We examine the entire record before the trial court at the time of the motion to determine whether it supports an inference of group bias. (*Battle,* at p. 773.)

While proof of a prima facie case may be established by any information in the record, our Supreme Court has identified "[c]ertain types of evidence [that] are especially relevant to this inquiry, including whether the prosecutor has struck most or all of the members of the venire from an identified group, whether a party has used a disproportionate number of strikes against members of that group, whether the party has engaged prospective jurors of that group in only desultory voir dire, whether the defendant is a member of that group, and whether the victim is a member of the group in which the majority of the remaining jurors belong." (*Battle*, *supra*, 11 Cal.5th at p. 773; *Scott*, *supra*, 61 Cal.4th at p. 384.) A court may also consider nondiscriminatory reasons for a peremptory challenge that are clearly established in the record and that necessarily dispel any inference of bias. (*Battle*, at p. 773; *Scott*, at p. 384.) However, "a reviewing court may not rely on a prosecutor's statement of reasons to *support* a trial court's finding that the defendant failed to make out a prima facie case of discrimination . . . . [T]he fact that the prosecutor volunteered one or more nondiscriminatory reasons for excusing the juror is of no relevance at the first stage." (*Scott*, at p. 390.)

First, while no prospective juror may be struck on improper grounds, our Supreme Court has explained that " '[a]s a practical matter, . . . the challenge of one or two jurors can rarely suggest a *pattern* of impermissible exclusion.' " (*Bell*, *supra*, 40 Cal.4th at p. 598; accord, *People v. Garcia* (2011)

52 Cal.4th 706, 747; *People v. Bonilla* (2007) 41 Cal.4th 313, 343 (*Bonilla*).) " 'Although circumstances may be imagined in which a prima facie case could be shown on the basis of a single excusal, in the ordinary case . . . to make a prima facie case after the excusal of only one or two members of a group is very difficult.' " (*Battle, supra,* 11 Cal.5th at p. 776; see *People v. Taylor* (2010) 48 Cal.4th 574, 614 [defense counsel failed to establish prima facie case based on fact that single excused juror was African-American]; *Bonilla,* at p. 343 [" 'the small absolute size of this sample makes drawing an inference of discrimination from this fact alone impossible' "].)

Here, there is evidence only that the prosecution used one peremptory strike against one African-American juror. The weakness of the record in this regard is compounded because defendants have failed to show how many of the prospective jurors were African-American or whether any African-American jurors were impaneled.[24] (Cf. *Battle, supra,* 11 Cal.5th at p. 774 [jury's composition served as "standalone evidence to inform [the Supreme Court's] step-one analysis" and was "particularly germane where the case was racially charged"]; *People v. Hawthorne* (2009) 46 Cal.4th 67, 79 [defendant bears burden of demonstrating inference of discrimination and in making prima facie showing "should make as complete a record of the circumstances as is feasible"].)

Second, defendants have not shown that the prosecutor's questioning of Prospective Juror B. was cursory or materially different from the questioning of other jurors. (*Bonilla, supra,* 41 Cal.4th at p. 343.) To the contrary, the prosecutor thoroughly questioned Prospective Juror B. about his own and his

---

[24] As noted above, when joining in the *Batson/Wheeler* challenge, Young's counsel noted that there may have been one or two other African-American jurors in the venire.

family's experiences with the criminal justice system and whether those experiences would affect his deliberations.

Third, while not required at this stage, the record of voir dire reveals reasons for excusing Prospective Juror B. that were valid, race-neutral reasons at the time of jury selection, including that he had multiple close family members (brothers and a nephew) who had been involved in serious criminal proceedings.[25] (See *People v. Reed* (2018) 4 Cal.5th 989, 1001 [relative's negative experience with law enforcement is "race-neutral hypothetical reason for a strike"]; *People v. Bryant* (2019) 40 Cal.App.5th 525, 537.) Moreover, Prospective Juror B. himself had been court-martialed—a process he described as "unfair"—and had spent 30 days in jail for a DUI. When asked if he felt the DUI was fair at the time, he responded, "No. Yeah. Because it's the way of writing tickets out for no reasons. So yeah." (See, e.g., *People v. Hardy* (2018) 5 Cal.5th 56, 82 [juror's belief he had been treated unfairly during prior arrest was race-neutral reason]; *People v. Winbush* (2017) 2 Cal.5th 402, 436 [juror's prior arrest was race-neutral reason].) While Prospective Juror B. also stated that he felt he could be fair, impartial, and apply the law, such responses do not raise any inference of bias when there are race-neutral reasons for excusing him that are clearly reflected in the record. (See, e.g., *Battle, supra*, 11 Cal.5th at p. 778; *Scott, supra*, 61 Cal.4th at p. 385.)

---

[25] Although Code of Civil Procedure section 231.7, as recently amended, provides that a juror's close relationship with someone who had been arrested is presumed to be an *invalid* reason, this statute was not yet in effect at the time of jury selection in this matter. (See Code Civ. Proc., § 231.7, subd. (i) [provision applies to "jury trials in which jury selection begins on or after January 1, 2022"].)

Finally, we reject defendants' arguments on appeal as to why the trial court erred in finding no prima facie showing at the first stage. Defendants complain that the trial court committed procedural error by substituting its own judgment for that of the prosecutor in stating race-neutral reasons on which a prosecutor *could* rely and commenting that Prospective Juror B.'s responses to questions on voir dire were evasive. We disagree. The trial court described these justifications *before* inviting the prosecutor to state her reasons. The court's comments merely show that the trial court was noting the existence of race-neutral reasons clearly established in the record. (*Scott*, *supra*, 61 Cal.4th at p. 384.) Further, the trial court's observation that Prospective Juror B. gave evasive responses was not a "highly subjective assessment" as defendants contend, but is reflected in his numerous equivocal answers to questions asked by both the court and the prosecutor.

Defendants also contend the trial court should have considered the documented and well-established recent history of racially discriminatory jury selection practices by the Contra Costa County District Attorney, but defendants did not raise this issue below and do not point to any evidence in the record before the trial court on this point. (See *Lenix*, *supra*, 44 Cal.4th at p. 624 [trial court's decision on *Batson/Wheeler* motion is reviewed on record as it stands at time of ruling].) Accordingly, the argument is forfeited. Defendants also rely on legislative intent reflected in Assembly Bill No. 3070 (Reg. Sess. 2019–2020) to mitigate the effects of bias in jury selection, but they concede that statute applies only prospectively to jury selection beginning on or after January 1, 2022. (Code Civ. Proc., § 231.7, subd. (i).) Their contention that the record in this case would be problematic under the new legislation is unpersuasive, as it clearly did not apply when the jury in this matter was selected.

28

In sum, we conclude the trial court correctly determined that defendants failed to make a prima facie showing of group bias with respect to Prospective Juror B. The *Batson/Wheeler* motion was properly denied.

## D. Third Party Culpability Evidence

Defendants next argue their judgments must be reversed because the trial court impermissibly excluded evidence regarding three other identified individuals who may have shot Singh.

### 1. Additional Background

Young moved to introduce, and the prosecution moved to exclude, evidence that (1) Andre Brewer, (2) Trevon Richardson, or (3) Cleashaun Hill may have shot Singh.

Andre Brewer's son was allegedly a victim of a robbery committed by Singh and Richardson a few weeks prior to Singh's murder. On October 22, 2018, Richardson texted Singh's father a screenshot of Brewer. The caption said something to the effect of, " 'This is the person who shot me.' " Defendants asserted the text was admissible to prove that Brewer killed Singh.

Defendants also sought to introduce evidence that Richardson himself and Cleashaun Hill each had motive and an opportunity to kill Singh, either to "save face" in Big Block or to avoid an obligation to pay Singh the remainder of the money he was owed for killing Matthew. D.Y., Singh's girlfriend at the time of his murder, told police that Singh told her that Hill hired him to kill Matthew, and Singh had only been paid part of what was promised for the job. She also said that Singh sent her a text on his way to meet with Hill to collect part of his payment stating that if anything "happen[ed]" to him, Hill did it. Singh's mother, D.S., corroborated some of D.Y.'s and Singh's statements.

29

Defendants also sought to introduce evidence that Singh had a gun at the time of the murder to prove Singh feared for his safety and to support the defense theory that "numerous people wanted him dead."

Before trial, the trial court held a hearing on third party culpability. Regarding the text message from Richardson to Singh's father indicating that Brewer shot Singh, the court questioned the parties about the details of Singh's alleged robbery of Brewer's son, then asked, "[O]ther than this motive that's been asserted here, what evidence is there that would link Mr. Brewer to the night of the shooting?" Young's counsel argued that because Richardson was an eyewitness to the shooting, his text to Singh's father stating that Brewer was the shooter was inconsistent with his statement to police on the night of the shooting that he did not know who did it. The court responded: "If you have an eyewitness who says, I was there, Mr. Brewer did this. I'm going to allow that person to testify to that. That would be evidence directly tying someone to this. [¶] But, as I understand the evidence, Mr. Richardson formed a belief, it was not based on personal observation of anything, and based on that belief that, ahh, this must be retaliation for the robbery, it had to be [Brewer], he then sent the picture off, and that's what led to the interview of Mr. Brewer." Young's counsel then argued that "[y]ou have to assume . . . that [Richardson] was truthful with the police" when he told them he did not know who did it, that he did not see the shooter—but that statement was inconsistent with what he told "everyone else but police"—that the shooter was Brewer.

The trial court told defense counsel they could bring Richardson in for an Evidence Code section 402 hearing (section 402 hearing), but barring testimony from Richardson or other witnesses that laid a foundation for his knowledge that Brewer was the shooter or otherwise connected Brewer with

30

the shooting, the court would not allow the evidence because it was hearsay, would confuse the jury, and failed to meet the standard set forth in *People v. Hall* (1986) 41 Cal.3d 826 (*Hall*) and subsequent decisions regarding admissibility of third party culpability evidence. Otherwise, the court ruled the robbery of Brewer's son was "completely irrelevant" and was "more [of] an effort to paint a picture of [Singh] and [Richardson] so that the jury is impassioned and inflamed against them." Thus, according to the court, the evidence was not only "actually prejudicial," but "also . . . confusing"; the court would not "try that robbery within this case," because there was insufficient evidence to connect them. The court then told the parties if something came out in discovery that connected Brewer with the murder, they could revisit the issue.

When the issue was raised again during trial, the prosecutor argued Richardson's statements on the 911 call—that he did not know who the shooter was and did not see the person—were not inconsistent in any way with his text to Singh's father indicating Brewer was the person who shot him. The trial court agreed and again sustained the prosecution's objection to admission of the text from Richardson to Singh's father.

Regarding the statements by D.Y. and D.S. that Hill hired Singh to kill Matthew but only paid him part of the amount owed, the court asked the parties what evidence other than those statements and motive would connect Hill to Singh's murder. Young's counsel responded the only other evidence was the text from Singh to D.Y. stating, " 'If anything happens to me, it's Hill and Richardson.' "[26] As with the Brewer evidence, the court stated it would

---

[26] Later in the hearing, Young's counsel conceded the statement " 'If anything happens to me, it's . . . Richardson' " was hearsay that would not be admissible to prove Richardson or Hill committed the murder.

31

allow a section 402 hearing if the parties had "witnesses who have admissible evidence that connects them to the killing" beyond just motive.

During D.Y.'s testimony at the section 402 hearing, the court again ruled her statements about what Singh told her were irrelevant and inadmissible. Defense counsel argued the statements were a declaration against penal interest when made, admissible under Evidence Code section 1230. The court observed they would be declarations against interest as to *Singh*, but not as to Richardson. The court further questioned the relevance of Singh's statements, observing the defendants had already gotten in, without objection from the prosecution, that Singh anticipated being paid $12,000 for Matthew's murder, and ruled there was no relevance to the amount he was actually paid.

The trial court also excluded any evidence that Singh was armed at the time of the shooting both because it was irrelevant and its relevance was substantially outweighed by its prejudicial effect under Evidence Code section 352.

At a hearing on March 10, 2020, Richardson invoked his Fifth Amendment right not to testify. The court refused to grant Richardson immunity in exchange for his testimony.

## 2. Analysis

Defendants contend the trial court erred in excluding (1) the text from Richardson to Singh's father with a photo of Brewer and a caption indicating Brewer shot Singh; (2) D.Y.'s statements (and D.S.'s corroborating statements) that Singh told D.Y. (a) Hill paid him to kill Matthew, (b) he had only been partially paid, and (c) if anything happened to him, Hill was responsible; and (3) evidence that Singh was armed at the time of the shooting, which corroborated D.Y's statements that Singh feared for his

safety. Defendants assert that all of the out-of-court statements were admissible under various hearsay exceptions and that the trial court violated their constitutional rights to present a defense and to a fair trial by excluding evidence that these other individuals may have been responsible for the murder.

We review a trial court's rulings excluding evidence at trial for abuse of discretion. (*People v. Turner* (2020) 10 Cal.5th 786, 817.)

### a. Brewer text

As an initial matter, the trial court did not err in excluding Richardson's text stating Brewer was the shooter because it was inadmissible hearsay, i.e., an out-of-court statement offered to prove the truth of the matter asserted. (Evid. Code, § 1200, subd. (a).) Defendants argue cursorily that the text was admissible "because it was a prior inconsistent statement by a hearsay declarant," citing to Evidence Code section 1202, but they fail to develop the argument.

In any event, Richardson's statement in the text message that Brewer was the shooter was simply not inconsistent with his statements in his 911 call that he did not see who shot him and did not know who the shooter was at the time of the murder. The text to Singh's father was sent over two months *after* the shooting, and contains no context or explanation for his assertion Brewer was the shooter. As the trial court so aptly explained in extensive colloquy with counsel, there is no reason to infer Richardson's statement was based on having *seen* the shooter, as opposed to having developed such a belief in the months following the shooting. Because defendants have not shown Richardson made any inconsistent statements, the text was inadmissible hearsay.

33

Further, as the trial court correctly concluded, without knowing whether Richardson's text was based on having actually seen Brewer, and in the absence of any other direct or circumstantial evidence linking Brewer to the crime, evidence that Brewer had a motive to kill Singh because Singh had robbed his son earlier was an insufficient basis for admission of the evidence. "To be admissible, . . . third-party evidence need not show 'substantial proof of a probability' that the third person committed the act; it need only be capable of raising a reasonable doubt of defendant's guilt. At the same time, we do not require that any evidence, however remote, must be admitted to show a third party's possible culpability. . . . [E]vidence of mere motive or opportunity to commit the crime in another person, without more, will not suffice to raise a reasonable doubt about a defendant's guilt: there must be direct or circumstantial evidence linking the third person to the actual perpetration of the crime." (*Hall*, *supra*, 41 Cal.3d at p. 833; accord, *People v. Turner*, *supra*, 10 Cal.5th at pp. 816–817.)

As the *Hall* court explained, "courts should simply treat third-party culpability evidence like any other evidence: if relevant it is admissible ([Evid. Code,] § 350) unless its probative value is substantially outweighed by the risk of undue delay, prejudice, or confusion ([*id.*,] § 352)." (*Hall*, *supra*, 41 Cal.3d at p. 834.) Here, the trial court carefully considered the facts of the case and reasonably concluded that Richardson's text was irrelevant because there was no basis to infer he had actually *seen* Brewer, and Richardson's unsubstantiated belief about the identity of the shooter was irrelevant.[27]

---

[27] We reject defendants' argument that *Hall* cannot be reconciled with article I, section 28, subdivision (f)(2) of the California Constitution or the accused's right to present a defense, the presumption of innocence, and the right to a fair trial. *Hall* was decided four years after enactment of the

(*Hall*, at p. 834 [admissibility of third party culpability evidence and balancing under Evid. Code, § 352 will always turn on facts of case].)

In addition to its concerns about relevance, the trial court excluded the text message because in the absence of testimony from Richardson or some evidence connecting Brewer to the shooting, his text message would be "completely confusing to a jury under [an Evidence Code section] 352 analysis." We agree. Assuming, as defendants argue, that the text were admissible to impeach Richardson's credibility, a jury may find it difficult to parse that purpose from the truth of the matter asserted in the statement. More significantly, without knowing the basis for Richardson's purported knowledge that Brewer was the shooter, its probative value was minimal. Further, the prosecution made an offer of proof that the police determined through Google location data that Brewer was at home at the time of the murder and that Brewer's hands were too disabled to pull the trigger of a firearm. Thus, the trial court could reasonably conclude the probative value of the text message was substantially outweighed by the potential for prejudice. (Evid. Code, § 352; *People v. Verdugo* (2010) 50 Cal.4th 263, 290–291 [trial court did not abuse discretion in excluding evidence that would require lengthy evidentiary detour into marginally relevant matter that would serve only to confuse jury].) For the same reasons, admitting the

---

"Right to Truth-in-Evidence" amendment to our state Constitution, and we are bound by it. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.) In any event, as we discuss further below, our Supreme Court in *Hall* instructed that third party culpability evidence is to be treated like any other evidence—if relevant, it is admissible subject to the court's discretion under Evidence Code section 352. (*Hall*, *supra*, Cal.3d at p. 834.) That rule does not run afoul of the right to truth-in-evidence provision, which provides that except as provided by statute, relevant evidence shall not be excluded in criminal proceedings. (Cal. Const., art. I, § 28, subd. (f)(2).)

Richardson text would result in an undue consumption of time and confusion of issues because the defense would seek to prove the circumstances of Brewer's son's robbery, while the prosecution would seek to introduce evidence that Brewer did not and could not have committed the murder. (Evid. Code, § 352; *People v. Rhoades* (2019) 8 Cal.5th 393, 417 [trial court did not abuse its discretion by excluding evidence where the consumption of time outweighed probative value].)

Nor are we persuaded by defendants' argument that the trial court's ruling gave the prosecution an unfair advantage because the prosecution's case relied "largely" on motive. The prosecution's theory that defendants murdered Singh in retaliation for Matthew's murder was supported by ample circumstantial evidence linking them directly to the murder—including text messages, video surveillance, and GPS location data. On this record, the trial court did not abuse its discretion in excluding Richardson's text messages regarding Brewer.

### b. *Singh's statements to D.Y. and D.S.*

Next, defendants contend the trial court erred by excluding evidence of Singh's statements, described above, to D.Y. and D.S.

First, D.Y.'s and D.S.'s statements to the police about what Singh told them are double hearsay. (Evid. Code, §§ 1200, 1201; *People v. Anderson* (2018) 5 Cal.5th 372, 403 [double hearsay admissible if there is a justification for admitting it at each level].) Defendants contend Singh's statements to D.Y. that Hill had hired him to kill Matthew and still owed him money were admissible as statements against penal interest (Evid. Code, § 1230), but they do not contend Singh's statement that if anything happened to him Hill was responsible would qualify for the same hearsay exception.

36

Even assuming all of the out-of-court statements were admissible, however, the trial court properly excluded them based on their lack of relevance. As discussed above, "evidence of mere motive or opportunity to commit the crime in another person, without more, will not suffice to raise a reasonable doubt about a defendant's guilt: there must be direct or circumstantial evidence linking the third person to the actual perpetration of the crime." (*Hall, supra,* 41 Cal.3d at p. 833.) Here, the only evidence connecting Hill to the murder was motive and opportunity evidence, but that is not enough to raise a reasonable doubt about defendants' guilt. Singh's statements to D.Y. about Hill owing him money for murdering Matthew were made immediately after he committed the crime on July 24, 2018. Likewise, Singh's text about Hill being responsible if anything happened to him was sent to D.Y. several days later while he was on his way to meet with Hill and another individual in a parking lot to collect part of his payment. Singh's statement to D.S. merely corroborated D.Y.'s statements that Singh was afraid of Hill when he went to collect his payment for Matthew's murder. At most, these statements taken together provide some tenuous evidence of a possible motive, but they do not provide any direct or circumstantial connection to the actual perpetration of Singh's murder on August 19, 2020. Any inference that Hill murdered Singh to avoid having to pay him the balance owed for Matthew's murder was purely speculative. As the trial court observed, "I mean, we can go through [Singh's] life and find out who all his enemies are, and then go through each one of those. [¶] . . . And pretty soon we're not even on the issues that [are] before this jury."

Defendants also contend in their appellate briefing that the "evidence that Hill wanted Singh dead also tended to support an inference that Richardson, undisputedly the last person to see Singh alive, shot Singh to

37

avoid himself being targeted by Hill. . . . In this alternative scenario, Richardson may have identified Brewer in an effort to deflect suspicion from him." Notwithstanding that defendants apparently failed to raise this argument in the trial court, the convoluted and speculative theory offers nothing more than an alternative possible motive for the murder. Accordingly, defendants have not shown the trial court abused its discretion in excluding Singh's statements.

In sum, because the evidence regarding Hill's and Richardson's purported motives for killing Singh was not supported by any other direct or circumstantial evidence connecting them to Singh's murder, the trial court did not err in excluding the statements.

### c. Singh's gun

Defendants also contend the trial court erred by excluding evidence that Singh was armed on the night of his murder because it corroborated D.Y.'s statements that Singh feared for his safety. But even assuming we can infer Singh carried a gun because he feared for his safety, defendants fail to explain how such a generalized fear tends to raise a reasonable doubt as to defendants' guilt. As Webb's counsel argued to the trial court, the fact that Singh carried a gun might be relevant to a "third-party culpability argument that *numerous people* wanted him dead, *numerous people* had a motive" (italics added), but without more it does not tend to prove Hill or Richardson (or any other individual for that matter) shot him. Because defendants have failed to explain the relevance of the evidence that Singh was armed at the time of the murder, we conclude the trial court did not abuse its discretion in excluding the evidence.

### d. Federal constitutional error

38

Finally, we reject defendants' argument that the trial court's exclusion of third party culpability evidence violated their federal due process rights and their rights to present a defense. "[T]he routine application of provisions of the state Evidence Code law does not implicate a criminal defendant's constitutional rights." (*People v. Jones* (2013) 57 Cal.4th 899, 957; *Hall, supra,* 41 Cal.3d at p. 834.) "[O]nly evidentiary error amounting to a complete preclusion of a defense violates a defendant's federal constitutional right to present a defense." (*People v. Bacon* (2010) 50 Cal.4th 1082, 1104, fn. 4.) There was no violation of defendants' constitutional rights.

### E. Assembly Bill 333

Defendants next argue the judgments must be reversed based on changes to section 186.22 that redefined the offense of active participation in a criminal street gang. First, they contend the record lacks substantial evidence of every element necessary to the prosecution's gang case under the amended statute. Alternatively, they argue they are entitled to a new trial because the trial court's instructions to the jury omitted crucial elements of the offense under the new law.

Section 186.22 criminalizes active participation in a "criminal street gang," and enhances the punishment for certain crimes committed "for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in criminal conduct by gang members." (§ 186.22, subds. (a), (b)(1); *People v. Tran* (2022) 13 Cal.5th 1169, 1205–1206 (*Tran*).) The jury in this case found defendants guilty of participation in a criminal street gang and found true the gang enhancements on the murder and conspiracy to commit murder convictions.

Effective January 1, 2022, Assembly Bill 333 changed section 186.22 in several important respects. (Stats. 2021, ch. 699, § 3.) "First, it narrowed the

definition of a 'criminal street gang' to require that any gang be an 'ongoing, *organized* association or group of three or more persons.' (§ 186.22, subd. (f), italics added.) Second, whereas section 186.22, former subdivision (f) required only that a gang's members 'individually *or* collectively engage in' a pattern of criminal activity in order to constitute a 'criminal street gang,' Assembly Bill 333 requires that any such pattern have been '*collectively* engage[d] in' by members of the gang. (§ 186.22, subd. (f), italics added.) Third, Assembly Bill 333 also narrowed the definition of a 'pattern of criminal [gang] activity' by requiring that (1) the last offense used to show a pattern of criminal gang activity occurred within three years of the date that the currently charged offense is alleged to have been committed; (2) the offenses were committed by two or more gang 'members,' as opposed to just 'persons'; (3) the offenses commonly benefitted a criminal street gang; and (4) the offenses establishing a pattern of gang activity must be ones other than the currently charged offense. (§ 186.22, subd. (e)(1), (2).) Fourth, Assembly Bill 333 narrowed what it means for an offense to have commonly benefitted a street gang, requiring that any 'common benefit' be 'more than reputational.' (§ 186.22, subd. (g).)" (*Tran, supra*, 13 Cal.5th at p. 1206.) "Examples of a common benefit that are more than reputational may include, but are not limited to, financial gain or motivation, retaliation, targeting a perceived or actual gang rival, or intimidation or silencing of a potential current or previous witness or informant." (§ 186.22, subd. (g).)

Under the principles enunciated in *In re Estrada* (1965) 63 Cal.2d 740, Assembly Bill 333's amendments to section 186.22 apply retroactively to defendants whose convictions are not yet final. (*Tran, supra*, 13 Cal.5th at pp. 1206–1207.) The changes to the definitions of "criminal street gang" and "a pattern of criminal gang activity" in Assembly Bill 333 effectively added

40

new elements to section 186.22, on which the jury was not instructed, implicating defendants' right to a jury trial under the Sixth Amendment. (*Tran*, at pp. 1206–1207; *People v. E.H.* (2022) 75 Cal.App.5th 467, 477, 479.) Accordingly, we must reverse unless it appears beyond a reasonable doubt that the error did not contribute to the verdict. (*Tran*, at p. 1207.)

As an initial matter, we reject defendants' argument that we must reverse the judgments due to a lack of *substantial evidence* under the elements of the amended statute. Although, for reasons we explain below, the recent passage of Assembly Bill 333 requires that we reverse the defendants' gang-related convictions and vacate the enhancements, any substantial evidence analysis for purposes of deciding whether double jeopardy principles preclude a retrial must necessarily be determined under the law applicable at trial. (See, e.g., *People v. Sek* (2022) 74 Cal.App.5th 657, 669–670 (*Sek*) [instructional error omitting elements of gang enhancements under amended § 186.22 permitted retrial because court did not reverse based on insufficiency of the evidence required by statute applicable at time of trial]; *People v. Eagle* (2016) 246 Cal.App.4th 275, 280 ["When a statutory amendment adds an additional element to an offense, the prosecution must be afforded the opportunity to establish the additional element upon remand."]; *People v. Shirley* (1982) 31 Cal.3d 18, 71 [double jeopardy does not bar retrial after reversal premised on error of law].) Defendants do not contend the evidence was insufficient to meet the elements of section 186.22 in effect at the time of trial, and thus reversal is not compelled on that basis.

Defendants next argue they are entitled to a new trial because the trial court's instructions to the jury under former versions of CALCRIM Nos. 1400 and 1401 omitted elements necessary to the gang allegations. The Attorney

41

General concedes there were instructional errors and that the jury's determination that the predicate offenses benefitted the gang was likely based, in part, on reputational benefits. Nonetheless, the Attorney General asserts, there was also substantial evidence in support of every newly modified element and the evidence in the record was sufficient for this court to conclude that the instructional errors were harmless beyond a reasonable doubt. We disagree.

Under section 186.22, as amended, to prove a " 'pattern of criminal gang activity,' " the prosecution must prove at least two enumerated predicate offenses commonly benefitted the gang in a way that is more than reputational. (§ 186.22, subd. (e)(1).)

Our Supreme Court recently addressed the appropriate test for harmless error under *Chapman* when the jury is not instructed as to these new elements. "When a jury instruction has omitted an element of an offense, our task 'is to determine "whether the record contains evidence that could rationally lead to a contrary finding with respect to the omitted element." ' " (*People v. Cooper* (2023) 14 Cal.5th 735, 742–743; *Tran, supra*, 13 Cal.5th at p. 1207 ["When a substantive change occurs in the elements of an offense and the jury is not instructed as to the proper elements, the omission implicates the defendant's right to a jury trial under the Sixth Amendment, and reversal is required unless 'it appears beyond a reasonable doubt' that the jury verdict would have been the same in the absence of the error."]; *People v. Mil* (2012) 53 Cal.4th 400, 417.)

In *Cooper*, the Supreme Court held the failure to instruct the jury that the predicate offenses must have commonly benefitted the gang in a way that is more than reputational was not harmless beyond a reasonable doubt where the record contained no evidence of those elements with respect to the

predicate offenses themselves. (*Cooper*, *supra*, 14 Cal.5th at pp. 743–744.) The two predicate offenses used to establish the " 'pattern of criminal gang activity' " in *Cooper* were a robbery and a narcotics sale, each committed by a different gang member. (*Id.* at pp. 740–741.) Although a gang expert had testified that the gang's primary activities included robbery and the sale of narcotics, the court drew a distinction between "the question of whether an offense is one of the gang's primary activities" and "the question of whether a particular offense has 'commonly benefitted a criminal street gang.' " (*Id.* at p. 743.) "A jury determination regarding the gang's primary activities merely constitutes a conclusion about the types of activities in which a gang typically engages, whereas the question about a common benefit asks about how the specific predicate offense actually benefitted the gang." (*Ibid.*) Because the totality of the evidence showed only that there was a robbery and a sale of narcotics by gang members and that those were primary activities of the gang, the court could not conclude beyond a reasonable doubt that the error did not contribute to the verdict. (*Id.* at p. 746.)

At trial in this case, the prosecution offered evidence of five convictions of Big Block members for felon in possession of a firearm (§ 29800) for offenses committed on various dates in 2014, 2015, 2016, and 2018, proven through certified records of conviction and Manning's testimony. Officers also testified about two other incidents involving possession of a firearm. In the first incident on December 24, 2016, Manning and another officer saw video surveillance footage of Young discarding a gun under a Pepsi machine after a shooting with a rival gang. Another gang member discarded a second firearm in the hallway. An officer testified about a second incident that occurred on January 2, 2018, when he served a narcotics arrest warrant at Young's house. Young discarded a firearm at the rear of the house which

officers recovered after his arrest.  In addition, Manning testified about two murders by Big Block members: (1) Lee Sullivan was a Big Block member convicted in 2019 for a murder that occurred in July 2013; and (2) Michael Higginbotham was a Big Block member who was convicted of shooting and murdering a Westmob gang member, Germane "Marley" Jackson.  Manning testified Michael was in jail for that murder when Matthew was murdered in July 2018.

As to the five convictions for possession of a firearm by a felon, Manning did not offer any testimony at all that the offenses benefitted the gang.  The Attorney General suggests the jury could infer from Manning's general testimony that one of Big Block's primary activities was possession of "gang guns" that are passed between members and that every instance of illegal firearm possession was for the benefit of the gang.  Manning did not, however, testify that any of the guns used in the five convictions were "gang guns" or that any of those instances involved providing a "gang gun" to a fellow gang member.  Nor did he testify to any other common benefit to the gang from these five offenses.

The limited evidence in the record regarding the murders committed by Big Block members is also insufficient for us to conclude the jury would have found a pattern of criminal gang activity beyond a reasonable doubt.  Manning's testimony regarding Lee Sullivan did not include any testimony that the murder was committed for the common benefit of the gang or benefitted the gang in a way that was more than reputational.[28]  (See *Cooper*, *supra*, 14 Cal.5th at p. 743 [prosecution never introduced any evidence about

---

[28] Manning's testimony that Lee Sullivan was convicted of murder for killing a rival gang member was offered in response to a question about Manning's testimony as a gang expert in other cases, not as a basis to prove a pattern of criminal gang activity.

how the gang commonly benefitted from predicate crimes].)  As to Michael, the Attorney General asks us to "infer" the crime occurred within three to six years before Singh's murder because Michael was in jail for Jackson's murder when Matthew was murdered in July 2018.  We cannot determine beyond a reasonable doubt the predicate offense occurred within the statutory timeframe where the record lacks any information about the date of the crime.  The Attorney General also asserts the jury could infer from the fact that Michael killed a rival gang member that the crime benefitted Big Block, citing section 186.22, subdivision (g).[29]  But Manning did not testify to such benefit.  (See *Cooper*, at p. 743, fn. 7 [rejecting Attorney General's argument that *Chapman* inquiry concerns question whether the jury could draw a reasonable inference that the alleged predicate offenses commonly benefitted the gang].)  In addition, the prosecution did not rely on either the Lee Sullivan or Michael Higginbotham murder convictions in arguing a pattern of criminal gang activity to the jury.

As to the testimony regarding Young's conduct as a felon in possession of firearms on two separate occasions, the question is somewhat closer.  Regarding the December 24, 2016 incident, the prosecutor asked Manning whether, in his opinion, Young was "furthering gang conduct when he hid that gun under the machine so him [*sic*] and his group wouldn't be found out by police," to which Manning replied, "Absolutely."  That testimony appears to describe a common benefit *to the gang* that was more than reputational— i.e., Young was hiding guns to prevent the police from discovering him and

---

[29] Section 186.22, subdivision (g) provides examples of a common benefit that are more than reputational "*may* include . . . targeting a perceived or actual gang rival . . . ."  (Italics added.)

45

other gang members in the wake of a rival gang shooting.[30]  As to the January 2018 incident, however, the prosecutor asked whether Young was acting "to further the criminal conduct *of a gang member* by hiding that gun." (Italics added.)  Manning responded, "Sure. . . . sounds like from the testimony he was attempting to hide a gun so that Darius York wouldn't be arrested with it."  That testimony is more equivocal as to whether the crime provided a common benefit to the gang that was more than reputational, or whether he committed the crime only to help his friend, York, avoid arrest.

Finally, as in *Cooper*, the jury here was specifically instructed that the predicate offenses that establish a pattern of criminal gang activity need not be gang-related, which directly contradicts the new requirement that predicate offenses commonly benefit the gang and that the common benefit is more than reputational.  (See *Cooper*, *supra*, 14 Cal.5th at p. 744.)

On this record, given the absence of evidence of at least two predicate crimes that commonly benefitted Big Block, or that the common benefit to the gang from those predicate offenses was more than reputational, we cannot conclude beyond a reasonable doubt that the instructional error did not contribute to the jury's verdicts.[31]  (See *Cooper*, *supra*, 14 Cal.5th at p. 746;

---

[30] The Attorney General contends one of Young's fellow gang members discarded a second firearm in the hallway during that incident.  There was no testimony, however, that the unidentified person who discarded the second firearm was a gang member, a felon, or otherwise prohibited from carrying a weapon or committed an offense for the common benefit of the gang beyond reputational benefit.

[31] Because we conclude remand is required based on the absence of evidence in the record that two predicate offenses were committed for the common benefit of the gang and that the benefit was more than reputational, we need not consider the parties' additional arguments regarding the failure to instruct on the requirement that the gang be "organized" and that the predicate offenses were committed "collectively."

*Tran*, *supra*, 13 Cal.5th at p. 1207 [reversing gang enhancements where jury was not presented with evidence gang members collectively engage in pattern of criminal gang activity].)

The changes made by Assembly Bill 333 affect not only the gang offense and enhancement allegations under section 186.22, but other statutes that incorporate section 186.22 by reference, including section 12022.53. (*Cooper*, *supra*, 14 Cal.5th at p. 746; *People v. Lopez* (2021) 73 Cal.App.5th 327, 346–348.) Because the jury's true findings on the enhancements under section 12022.53, subdivision (e) required findings that defendants committed the murder for the benefit of a criminal street gang, those findings must also be vacated.

We reject defendants' arguments, however, that reversal of their convictions on the gang offenses and true findings on the gang enhancements also requires us to reverse their murder and conspiracy to commit murder convictions. Defendants contend the prosecution's theory of the case was that intent to kill could be inferred from their gang motivation to retaliate on behalf of Big Block, and "[d]ue to the centrality of the gang evidence to the People's entire case, the failure of the evidence with respect to the substantive gang offense and the enhancement mandates that the entire judgment be vacated." Defendants cite no authority in support of this argument, and we are not persuaded. The murder and conspiracy to commit murder offenses did not incorporate section 186.22, nor was meeting the requirements of that statute necessary for the jury to find beyond a reasonable doubt that defendants committed those crimes. The evidence regarding the gang motive for the murder and conspiracy would have been admissible notwithstanding the section 186.22 charges, and defendants have not shown any reason the entire judgment should be reversed. (See, e.g.,

47

*People v. Hernandez* (2004) 33 Cal.4th 1040, 1049 [evidence of gang membership and activity can help prove identity, motive, specific intent, and other issues pertinent to guilt]; *People v. Ramirez* (2022) 13 Cal.5th 997, 1095 [evidence of gang membership is admissible on the charged offense assuming its probative value outweighs its prejudice].)

Accordingly, we shall reverse defendants' convictions for active participation in a criminal street gang (§ 186.22, subd. (a); count 4); vacate the true findings on the gang-related firearm enhancement (§ 12022.53, subd. (e); count 1); and vacate the true findings on the gang enhancement allegations (§ 186.22, subd. (b)(5); counts 1 & 3.)  The prosecution will have the option to retry these counts and enhancements on remand.

## F.  *Lying-in-wait Special Circumstance*

Defendants next argue the lying-in-wait special circumstance findings on their murder convictions must be stricken because the record lacks substantial evidence of every element necessary for that finding.

"A sufficiency of evidence challenge to a special circumstance finding is reviewed under the same test applied to a conviction.  [Citation.]  Reviewed in the light most favorable to the judgment, the record must contain reasonable and credible evidence of solid value, 'such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' " (*People v. Stevens* (2007) 41 Cal.4th 182, 201.)

"The ' "lying-in-wait special circumstance requires ' " 'an intentional murder, committed under circumstances which include (1) a concealment of purpose, (2) a substantial period of watching and waiting for an opportune time to act, and (3) . . . a surprise attack on an unsuspecting victim from a position of advantage . . . .' " ' " ' " (*People v. Parker* (2022) 13 Cal.5th 1, 58.)

48

The record in this case reveals substantial evidence as to each of the required elements.

Concealment, as required to prove the lying-in-wait special circumstance, " 'is that which puts the defendant in a position of advantage, from which the factfinder can infer that lying-in-wait was part of the defendant's plan to take the victim by surprise. [Citation.] It is sufficient that a defendant's true intent and purpose were concealed by his actions or conduct.' " (*People v. Morales* (1989) 48 Cal.3d 527, 555, overruled on another ground in *People v. Williams* (2010) 49 Cal.4th 405, 459; *People v. Ceja* (1993) 4 Cal.4th 1134, 1140.) Here, there was ample evidence of concealment—both of defendants' purpose and physical concealment. Defendants and their coconspirators located Singh at City Nights and communicated that information with each other. They kept track of when Singh left City Nights and followed him back to Antioch. The evidence that defendants remained several minutes behind Singh's car supports an inference that they were concealing both their presence and purpose. When Webb saw Singh drive by the Valero gas station, he ducked—literally concealing himself behind his car. Further, when he pulled out of the gas station to follow Singh, he did so with his headlights turned off, again supporting a reasonable inference he was both concealing his purpose and preventing Singh and Richardson from seeing him.[32]

---

[32] Young contends this case is like *People v. Nelson* (2016) 1 Cal.5th 513, in which our Supreme Court concluded the evidence was insufficient to support instructions on lying-in-wait first degree murder and special circumstance allegations. We disagree. While Young relies on *Nelson* to argue insufficient evidence of *concealment*, the defendant in that case argued the prosecution failed to prove he had engaged in a substantial period of *watching and waiting* for a favorable or opportune time to act. (*Id.* at

49

Defendants effectively concede that evidence they tracked Singh and Richardson's locations to City Nights, then followed them from San Francisco to the Mira Vista apartments in Antioch would be sufficient evidence to satisfy the watching and waiting requirement. As our Supreme Court has explained, "the purpose of the watching and waiting element ' " 'is to distinguish those cases in which a defendant acts insidiously from those in which he acts out of rash impulse. [Citation.] This period need not continue for any particular length " 'of time provided that its duration is such as to show a state of mind equivalent to premeditation or deliberation.' " ' " ' " (*People v. Flinner* (2020) 10 Cal.5th 686, 749.) In addition to the evidence referenced by defendants, there was evidence that defendants arrived at the Mira Vista apartments before Singh and Richardson, and that Young waited there, while Webb left. Webb then went to the Valero gas station and after Singh and Richardson's car passed by, he ducked, got into his car, pulled out

pp. 550–551.) In *Nelson,* the defendant went to where he expected the victims to be in a Target parking lot, then hid his bicycle, and snuck up behind them on foot to take them by surprise. (*Id.* at p. 551.) The court explained that there was no evidence that the defendant "arrived before the victims or waited in ambush for their arrival. In the absence of such evidence, there is no factual basis for an inference that before approaching the victims, he had concealed his bicycle and waited for a time when they would be vulnerable to surprise attack. The jury was presented with no evidence from which it could have chosen, beyond a reasonable doubt, that scenario over one in which defendant arrived after the victims, dismounted from his bicycle, and attacked them from behind without any distinct period of watchful waiting." (*Ibid.*) Here, by contrast, there *was* evidence from which a jury could draw a reasonable inference that Young and Webb arrived at the murder scene before the victims, and Young waited there for their arrival while Webb went to find them. In addition, unlike *Nelson*, there was substantial evidence Young and Webb had tracked Singh's location all evening and followed him while concealing their purpose, further supporting a reasonable inference of a substantial period of watching and waiting.

of the Valero station, and followed them with his headlights off even though he had only pumped less than half of the $40 in gas he had prepaid. From this evidence, the jury could reasonably infer Webb and Young were watching and waiting for Singh and Richardson to arrive at the Mira Vista apartments where they could surprise them.

Finally, there was substantial evidence defendants made a surprise attack from a position of advantage. Singh's car was discovered by police with its engine still running and headlights on. The evidence supports a reasonable inference that after Singh parked his car in the carport, Webb and Young approached his car quickly and shot him before he had the chance to turn off the car. Further, the jury could infer both defendants approached Singh's car in separate cars because an eyewitness saw three cars leave the scene. The jury also could reasonably infer the attack was a surprise because Richardson told the 911 operator that he did not see the shooter, did not know who shot them, and did not know where the shooting came from.

Moreover, defendants had an advantageous position because Singh was confined by his car and easily visible through the open driver's side window.[33] Defendants, on the other hand, had free range of movement either on foot or by car—including two separate vehicles.

---

[33] An officer testified that during his investigation at the murder scene, he discovered the driver's side window of Singh's Infiniti was missing. It appeared to have been broken recently based on the number and size of glass fragments remaining in the window frame. He also believed that the window had been broken at a different location, because there was not a substantial amount of glass inside or outside the vehicle. Shortly before the murder, while he was at the Chevron gas station with Singh, Richardson ran several Internet searches on his phone regarding the cost of replacing a driver's side window on an Infiniti FX45.

51

In sum, there was substantial evidence to support the lying-in-wait special circumstance.

## G. Sentencing Issues

Defendants assert two errors at sentencing: first, they contend their sentences for life without the possibility of parole on their conspiracy convictions must be stricken as unauthorized because the murder and conspiracy were part of a continuous course of conduct pursuant to a single objective; and second, they contend the matter must be remanded for the trial court to choose whether to stay punishment for the murder or the conspiracy counts under section 654.[34]  The Attorney General concedes error and agrees defendants must be sentenced to 25 years to life on their conspiracy convictions.  The Attorney General also agrees sentences cannot be imposed on both defendants' murder and conspiracy convictions under section 654, but asserts we should direct the trial court to stay the conspiracy sentences.

We agree defendants must be resentenced to terms of 25 years to life on the conspiracy convictions.  The punishment for conspiracy to commit murder is the same as for first degree murder, but the special circumstances in section 190.2 do not apply to conspiracy to commit murder.  (*People v. Hernandez* (2003) 30 Cal.4th 835, 868–870 (*Hernandez*), overruled in part on another ground in *People v. Riccardi* (2012) 54 Cal.4th 758, 824, fn. 32, disapproved on another ground in *People v. Rangel* (2016) 62 Cal.4th 1192, 1216; see *People v. Lopez* (2022) 12 Cal.5th 957, 963–965.)  Thus, the trial

---

[34] Defendants also argued that to the extent the active participation convictions survived their challenge based on the statutory amendments to section 186.22, they would be entitled to resentencing on those counts under section 654.  We need not address that argument because we have already determined the active participation convictions must be reversed for reasons explained above.

52

court should not have imposed the same life without possibility of parole sentence it imposed for the murder count (based on the § 190.2 lying-in-wait special circumstance) on the conspiracy count.  (See *People v. Scott* (1994) 9 Cal.4th 331, 354 [sentence is unauthorized when court violates mandatory provisions governing the length of confinement].)

Moreover, because the murder and conspiracy to commit murder convictions had the same objective (killing Singh), section 654 precludes defendants from being punished more than once.  (*Hernandez, supra,* 30 Cal.4th at p. 866.)  Accordingly, we will remand with directions to the trial court to sentence defendants to 25 years to life on their conspiracy to commit murder convictions and exercise its discretion to determine whether to stay the sentences for murder or the sentences for conspiracy to commit murder.[35]

## H.  Cumulative Error

Defendants contend the cumulative effect of the multiple errors at trial identified above requires reversal of the judgment.  Under the cumulative error doctrine, "a series of trial errors, though independently harmless, may in some circumstances rise by accretion to the level of reversible and prejudicial error."  (*People v. Hill* (1998) 17 Cal.4th 800, 844.)  As we have discussed in detail above, we have rejected defendants' individual claims of error and, accordingly, there is no prejudice to accumulate.  Any potential

---

[35] At the time of defendants' original sentencing, the trial court would have been required to impose the longest potential term of imprisonment. (Former § 654, subd. (a).)  Effective January 1, 2022, however, Assembly Bill No. 518 (2021–2022 Reg. Sess.) amended section 654 to provide that when an act or omission is punishable by different provisions, the defendant "may be punished under either of such provisions."  (§ 654, subd. (a).)  Assembly Bill No. 518 applies retroactively.  (*Sek*, *supra*, 74 Cal.App.5th at p. 673.)  Thus, on remand the trial court will have discretion under the new version of section 654 to sentence defendants under either provision.

errors we have considered separately and found to be harmless; we reach the same conclusion considering them collectively.

## III. DISPOSITION

Defendants' convictions for active participation in a criminal street gang (§ 186.22, subd. (a); count 4) are reversed. The true findings on the gang enhancement allegations (§ 186.22, subd. (b)(5); counts 1 & 3) and gang-related firearm enhancements (§ 12022.53, subd. (e); count 1) are vacated. The prosecution will have the option to retry these counts and enhancements on remand. Further, the trial court is directed to resentence defendants to 25 years to life on their conspiracy convictions, and exercise its discretion under section 654 whether to stay the conspiracy terms or the terms for defendants' murder convictions. The judgments are otherwise affirmed.

MARGULIES, J.

WE CONCUR:

HUMES, P. J.

BOWEN, J.*

A161098
*People v. Webb*
A161100
*People v. Young*

---

      \* Judge of the Contra Costa County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.